IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WASHINGTON,<br><br>　　　　　　　Petitioner,<br><br>vs.<br><br>PAT L. VAZQUEZ, Acting Warden,<br>California Correctional Institution,[1]<br><br>　　　　　　　Respondent. | No. 2:14-cv-01618-JKS<br><br>MEMORANDUM DECISION |

James Washington, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Washington is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the California Correctional Institution in Tehachapi, California.  Respondent has answered, and Washington has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On March 5, 2009, Washington, along with his co-defendant Frank Abella, was charged with first-degree murder committed during the commission of a robbery, second-degree robbery, and torture.  The information further alleged as to all counts that Washington personally used a deadly and dangerous weapon while committing the offenses.  Washington pleaded not guilty and denied the allegations.  On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Washington:

---

[1]　　　　Pat L. Vazquez, Acting Warden, California Correctional Institution, is substituted for Stu Sherman, Warden, California Substance Abuse Treatment Facility and State Prison.  FED. R. CIV. P. 25(c).

During the early morning hours of June 7, 2008, [Washington] and Abella were hanging out together at an apartment complex in Rancho Cordova where Abella's mother lived. At the time, [Washington] was dating Abella's sister, E.G., who was also present.

At approximately 2:40 a.m., [Washington] and Abella walked to a nearby 7–Eleven store. The events that occurred thereafter were captured in large part on surveillance cameras mounted at the 7–Eleven and at an adjacent check-cashing store.

At approximately 2:50 a.m., [Washington] and Abella left the 7–Eleven and approached 50–year–old William Deer, who was sitting on a curb outside the check-cashing store drinking coffee he had just purchased at the 7–Eleven. Deer was both mentally and physically handicapped due to a motorcycle accident more than 20 years earlier.

Earlier that evening, Deer's mother had dropped him off at a bus stop in Sacramento so he could visit friends in Rancho Cordova. At the time, Deer wore a fanny pack around his waist in which he carried various personal items, including a cell phone charger, a toothbrush, cigarettes, and money. He also carried with him a cell phone. Deer was wearing the fanny pack in the 7–Eleven approximately 30 minutes before he was approached by [Washington] and Abella.

What transpired during the initial encounter with Deer is not altogether clear. However, what is clear is that, at some point, [Washington] and Abella beat, kicked and stomped on Deer and then ran from the scene.

Approximately 30 minutes later, [Washington] returned to the area with E.G. By that time, [Washington] had changed his shirt. The two approached Deer, who was still lying where [Washington] and Abella had left him following the beating. E.G. could see that Deer was hurt but he was still alive. [Washington] and E.G. departed.

Seven minutes later, [Washington] and Abella returned to where they had left Deer. Less than a minute later, they again ran from the scene.

[Washington] and Abella returned a third time approximately 30 minutes later, this time with a BB gun. They shot Deer 19 times in the face and abdomen and then fled the scene.

Police were eventually dispatched to the 7–Eleven and found Deer still alive. They did not find a fanny pack or cell phone in the area; nor did they find any identification for the victim. Deer was taken to the hospital, where he later died. The cause of death was determined to be multiple blunt force head injuries plus multiple BB pellet injuries.

Five days later, [Washington] and Abella were arrested. They were charged with murder, robbery and torture and were tried separately.

*People v. Washington*, No. C065636, 2013 WL 29097, at *1-2 (Cal. Ct. App. Jan. 3, 2013).

At the conclusion of Washington's trial,[2] the jury found Washington guilty of all counts and also found true the special circumstance alleged in Count 1 and the enhancements alleged on each count.  The trial court subsequently denied Washington's request for probation and sentenced him to serve a term of life imprisonment without the possibility of parole for committing murder while engaged in robbery, consecutive to a 2-year term for the robbery conviction, consecutive to a life term for the torture conviction, plus 3 consecutive 1-year terms for the personal use of a dangerous or deadly weapon alleged as to all counts.  The court stayed the punishment imposed on Counts 2 and 3 pursuant to California Penal Code § 654.[3]

Through counsel, Washington appealed his conviction, arguing that: 1) the trial court's admission of his pretrial statement to law enforcement violated his *Miranda*[4] rights; 2) the evidence of first-degree murder, robbery, and the robbery-murder special circumstance was legally insufficient to support his convictions; 3) the trial court's erred by refusing to instruct the jury on the lesser-included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter; 4) the imposition of a term of life imprisonment without the possibility of parole constituted cruel and unusual punishment; and 5) the abstract of judgment should be corrected to reflect the sentence imposed.  The Respondent agreed that the abstract of

---

[2]      Prior to trial, the court suspended the criminal proceedings against Washington in order to have his competency to stand trial assessed pursuant to California Penal Code § 1368. The trial court resumed criminal proceedings after finding Washington competent to stand trial. That finding is not at issue in the instant case.

[3]      Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

[4]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

judgment should be modified but other opposed the appeal.  In a reasoned, unpublished opinion

issued on January 3, 2013, the Court of Appeal corrected the abstract of judgment but

unanimously affirmed the judgment in all other respects.  *Washington*, 2013 WL 29097, at *13.

Washington petitioned for review in the California Supreme Court, which was denied without

comment on April 10, 2013.  Washington's conviction became final on direct review 90 days

later, when his time to file a petition for *certiorari* in the Supreme Court expired on July 10,

2013.  *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796,

798 (9th Cir. 2003).

Washington then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court

on July 6, 2014.  *See* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Washington raises the four claims he

unsuccessfully raised to the state courts on direct appeal.  First, he argues that the trial court's

refusal to instruct the jury on lesser-included offenses denied him due process.  He next contends

that the imposition of a term of life imprisonment without the possibility of parole constitutes

cruel and unusual punishment.  Third, he alleges that the admission of his pretrial statement

violated his *Miranda* rights.  Finally, he argues that the evidence of first-degree murder and the

robbery-murder special circumstance was legally insufficient to support those convictions.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Washington has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

*Claim 1.*        Instructional Error – Lesser-Included Offenses

Washington first argues that the trial court erred by refusing to instruct the jury on lesser included offenses to malice murder.  The record indicates that the prosecution elected to prove first-degree murder solely on a theory of felony murder.  Washington requested instructions on lesser included offenses to first-degree murder, but the prosecutor argued that there are no lesser included offenses to felony murder.  The trial court agreed with the prosecution and refused to

give the requested instructions.  Washington now argues, as he did on direct appeal, that the

court's refusal to give the instructions violated his constitutional rights.  The Court of Appeal

considered and rejected his claim as follows:

> In any criminal matter, the jury must be instructed on all crimes necessarily
> included within the offense charged if there is substantial evidence from which a
> reasonable jury could conclude the defendant is guilty only of the lesser offense.  (*People
> v. Birks* (1998) 19 Cal. 4th 108, 118.)  This obligation exists even absent a request and
> even over the parties' objections.  (*Ibid*.)  "Where the evidence warrants, the rule ensures
> that the jury will be exposed to the full range of verdict options which, by operation of
> law and with full notice to both parties, are presented in the accusatory pleading itself and
> are thus closely and openly connected to the case.  In this context, the rule prevents either
> party, whether by design or inadvertence, from forcing an all-or-nothing choice between
> conviction of the stated offense on the one hand, or complete acquittal on the other."  (*Id.*
> at p. 119.)

> [Washington] does not contest that there are no lesser included offenses to felony
> murder.  (*See People v. Cavitt*, *supra*, 33 Cal. 4th at p. 197; *People v. Balderas* (1985) 41
> Cal. 3d 144, 198.)  Rather, he argues the information also charged him with first degree
> malice murder, and the information was never amended thereafter to reflect the
> prosecution's election to rely instead on felony murder alone.  Thus, he argues, the issue
> of first degree malice murder was still before the jury, thereby warranting the lesser
> included offense instructions.

> In *People v. Anderson* (2006) 141 Cal.App.4th 430 (Anderson ), the defendant's
> conviction for first degree murder was reversed for failure to instruct on lesser included
> offenses.  (*Id.* at p. 435.)  In that case, the defendant was charged with first degree malice
> murder but, after the close of evidence, the prosecution amended the information to
> charge felony murder.  However, it could not be determined from the record if this felony
> murder charge supplanted or was in addition to the malice murder charge.  (*Id*. at p. 445.)
> The Court of Appeal concluded the defendant was entitled to instructions on second
> degree murder and voluntary manslaughter either way.  The court explained: "If the
> original charge of murder remained, the sua sponte duty to instruct as to lesser offenses
> did as well.  Even if felony murder had been intended to replace the existing charge, an
> amendment made at the close of evidence does not satisfy the notice function that
> underpins the duty of sua sponte instruction.  [Citation.]  Having established the
> expectation that instruction on lesser included offenses of murder would be given, if
> supported by the evidence, the prosecution could not defeat that expectation by
> amendment after the close of evidence."  (*Id.* at pp. 445–446.)

> Assuming *Anderson* was correctly decided, the present matter is readily
> distinguishable in that, even before any evidence was presented, [Washington] was on
> notice that the prosecution would not be attempting to prove malice murder but was
> pursuing a theory of felony murder alone.  Hence, [Washington] could have had no

expectation that instructions on lesser included offenses to malice murder would be given.

"[A] trial court must instruct the jury sua sponte on an uncharged offense that is lesser than, and included in, a greater offense with which the defendant is charged only if there is substantial evidence that, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser." (*People v. Waidla* (2000) 22 Cal. 4th 690, 737.) When "'there is no evidence that the offense was less than that charged'" there is no duty to so instruct. (*People v. Barton* (1995) 12 Cal. 4th 186, 196, fn. 5.)

[Washington] contends there was evidence from which a reasonable jury could have concluded he formed an intent to steal after the assault that caused the victim's death. Hence, he argues, the jury could have concluded he was not guilty of felony murder but some lesser offense like second degree murder or manslaughter. We disagree.

[Washington] argues: "The jury almost certainly found that the acts resulting in death were committed prior to the taking." However, if the jury had so found, it would have done so based on speculation. There was no evidence presented that the initial assault alone caused the victim's death. On the contrary, the only expert to testify on the issue was Dr. Kathleen Enstice, who indicated the cause of death was the combination of the beating and the BB gun shots into the victim's face. The BB gun shots came after or contemporaneous with the robbery. Thus, it is not reasonably possible the jury could have concluded the murder preceded the robbery. Hence, the jury had no choice but to find either that the killing occurred during the course of a robbery, in which case [Washington] was guilty of felony murder, or it did not, in which case [Washington] was not guilty of felony murder. There was no situation in which the jury could have found [Washington] guilty of a lesser offense instead. The trial court was therefore under no obligation to give lesser included offense instructions.

*Washington*, 2013 WL 29097, at *6-7.

Washington fares no better on federal habeas review. First, to the extent he contends that the trial court's failure to instruct the jury on second-degree murder or involuntary manslaughter was erroneous under state law, his claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 71-72 ("[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief."); *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986) (citation omitted).

Second, as the Court of Appeal noted, and Washington conceded, it is not clear whether second-degree murder or involuntary manslaughter is a lesser included offense of felony murder

under California law.  To the extent they are not lesser included offenses of felony murder under California law, and since California criminal defendants are not entitled to jury instructions on lesser offenses that are merely related to a charged crime, it was reasonable for the Court of Appeal to conclude that the trial court did not err by refusing to instruct the jury on the lesser-included offenses.  The United States Supreme Court has clearly established that the Constitution requires, at most, that states "provide instructions only on those offenses that have been deemed to constitute lesser included offenses of [a] charged crime."  *Hopkins v. Reeves*, 524 U.S. 88, 96-97 (1998) (rejecting the notion that criminal defendants have "a constitutional right to an instruction on any offense that bears a resemblance to the charged crime and is supported by the evidence").  Here, the trial court refused to provide an instruction on offenses that it reasonably determined under California law were not lesser included offenses of the crime with which Washington was charged.  Consequently, the state courts' rejection of Washington's claim of instructional error on that basis does not run afoul of *Hopkins* and thus cannot be deemed contrary to or an unreasonable application of clearly established federal law.  *See generally Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("state court's decision [ ] not contrary to or an unreasonable application of clearly established federal law" where no Supreme Court holding specifically required application of Supreme Court precedent to facts of petitioner's case).

Third, even so, to the extent Washington argues that he had a constitutional right to have the jury so instructed because they are lesser included offenses of felony murder, he is not entitled to relief.  A trial court's failure to give a lesser included offense instruction in a non-capital case, such as this one, does not present a federal constitutional question that is cognizable on federal habeas review.  *See* 28 U.S.C. § 2254(a); *Solis v. Garcia*, 219 F.3d 922,

9

929 (9th Cir. 2000) (per curiam) (quoting *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984);

*see also Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court to

instruct on lesser included offenses in non-capital case does not present federal constitutional

question).

      Finally, to the extent Washington's claim could arguably be reviewed as a potential due

process violation, Washington is not entitled to federal habeas relief because he has not shown

that the trial court in his case committed an error under state law, much less one of constitutional

magnitude.  Here, the Court of Appeal reasonably concluded that substantial evidence did not

support giving an instruction on a lesser included offense of felony murder.  Specifically, the

Court of Appeal reasonably determined that petitioner was not entitled to such an instruction

because, in light of the evidence presented at trial, "it is not reasonably possible the jury could

have concluded the murder preceded the robbery.  Hence, the jury had no choice but to find

either that the killing occurred during the course of a robbery, in which case [Washington] was

guilty of felony murder, or it did not, in which case [Washington] was not guilty of felony

murder."  The Court of Appeal's conclusion is both reasonable and fully supported by the

record.  Accordingly, Washington is not entitled to relief on this claim.

      *Claim 2.*      <u>Cruel and Unusual Punishment</u>

      Washington next contends that his life without the possibility of parole ("LWOP")

sentence imposed for murder constituted cruel and unusual punishment in light of his limited

participation in the killing and because of his youth,[5] family background, and reduced mental capacity.

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments."  U.S. CONST. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).  In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts.  *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).  Where the crime is murder, even a life sentence without parole is not grossly disproportionate.  *See Harris v. Wright*, 93 F.3d 581, 584 (9th Cir. 1996) (life imprisonment without possibility of parole for aggravated first-degree murder raises no inference of gross disproportionality); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under *Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment.").  Furthermore, while the contours of the "gross disproportionality principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case.  *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

---

[5]     The record indicates that Washington's 18th birthday was 9 days before the offenses in this matter.

Within the last several years the United States Supreme Court has considered a number of Eighth Amendment cases involving juvenile offenders, that is, defendants who were under the age of 18 at the time they committed their offenses.  In *Roper*, 543 U.S. at 575, the Supreme Court held that "the death penalty is disproportionate punishment for offenders under 18."  The Supreme Court subsequently held in *Graham*, 560 U.S. at 75, that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."  In *Miller*, 132 S. Ct. at 2467, a case involving a juvenile who was 14 years old at the time he committed a murder, the Supreme Court held that a mandatory sentence of life without the possibility of parole violates the Eighth Amendment where a sentencing court has no discretion to consider the defendant's youth or other "mitigating qualities."

Although Washington stresses that he was only days removed from juvenile age when the offense occurred, the fact remains that he was legally an adult when he engaged in a felony that resulted in murder.  The state appellate court's decision therefore does not run afoul of *Miller*.

In support of his claim, Washington cites California cases in which the California Supreme Court held that potential life sentences imposed on youthful offenders constitutes cruel and unusual punishment.  However, in light of the applicable United States Supreme Court authority, it was not unreasonable for the state court to conclude that neither the fact that Washington was guilty of felony murder rather than direct murder, nor his age at the time of the offense, reduced mental capacity, or his family background rendered his sentence disproportionate to her crimes.  *See Harmelin*, 501 U.S. at 1004 (Kennedy, J., concurring) (stating that "no sentence of imprisonment would be disproportionate" for the crime of felony murder even though it does not require the specific intent to kill (quoting *Solem v. Helm*, 463

U.S. 277, 290 n.15 (1983))); *see also Martinez v. Duffy*, No C-13-5014, 2014 WL 547594, *1-2 (N.D. Cal. Feb. 7, 2014) (finding that a sentence of 25 years to life for murder as an aider and abettor committed when the petitioner was 17 years old was not cruel and unusual and thus concluding that a state court decision to that effect did not warrant relief pursuant to § 2254(d)); *Khalifa v. Cash*, No. ED CV 10-1446, 2012 WL 1901934, at *30-33 (C.D. Cal. Apr 10, 2012) (finding that a sentence of 25 years to life for first degree murder did not violate the Eighth Amendment where the petitioner was 15 years old at the time of his offense and was not the actual murderer but was only a lookout for the underlying felony which resulted in a murder), *report and recommendation adopted*, 2012 WL 1901932 (C.D. Cal. May 24, 2012)).

Nor can Washington demonstrate that this is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime and relevant criminal history.  As the Court of Appeal explained:

> The trial court was not required to accept [Washington's] self-serving claims putting most of the blame on his accomplice.  [Washington] may have a low I.Q., but it is not so low that he could not recognize the value in coloring his statements to police so as to deflect as much blame as possible.  [Washington] demonstrated street smarts while sparring with the police during his interview.  And [Washington] may have had a tough childhood, but that does not excuse the type of depraved conduct exhibited in this matter.
> Regarding the offense, it was [Washington], with his girlfriend, who first discovered that the victim was still alive and lying where he and Abella had left him 30 minutes earlier.  [Washington] then went back to the apartment, got his accomplice, and came back to finish the job.  Under the circumstances of this case, there is nothing cruel or unusual in imposing an LWOP sentence for the heinous murder committed by [Washington] on a relatively helpless victim.  We therefore conclude the sentence does not violate either the state or federal prohibition against cruel and unusual punishment.

*Washington*, 2013 WL 29097, at *8.

In short, the Court of Appeal's finding that the trial court's sentence was not grossly disproportionate to the crimes for which Washington was convicted in light of the circumstances

13

of the instant offense was not contrary to, or an objectively unreasonable application of, any

clearly established federal law and was not based upon an unreasonable determination of the

facts in light of the evidence presented.  Accordingly, Washington is not entitled to habeas relief

on his Eighth Amendment claim.

     *Claim 3.*     <u>*Miranda* Violation</u>

     Washington additionally alleges that the trial court erred in failing to suppress on

*Miranda* grounds his statements to law enforcement after the incident.  The Court of Appeal laid

out the following facts underlying this claim:

> [Washington] was arrested on June 12, 2008, and participated in a taped interview with Detective Stanley Swisher without the assistance of counsel.  During the interview, [Washington] admitted he and Abella beat the victim and took his fanny pack.  However, [Washington] placed most of the blame on Abella.
>
> [Washington] filed a motion to suppress the taped interview, arguing he has limited intelligence and did not understand the *Miranda* warnings read to him at the beginning.  The court denied the motion but later ordered portions of the interview redacted.  The remaining portions of the interview were thereafter played to the jury.
>
> [Washington] contends the trial court erred in denying his suppression motion. He argues the *Miranda* rights read to him "were both confused and confusing." [Washington] further asserts he never acknowledged he understood his right to remain silent and his acknowledgement that he had the right to counsel was more a willingness to agree to the assertions of the detective than an understanding of his rights. [Washington] argues "his cognitive abilities were insufficient to permit him to understand and waive his *Miranda* rights."  [Washington] presented expert evidence that his mental capacity was in the mildly retarded range and that heavy drug and alcohol use during his adolescence "may have caused a brain impairment."
> . . . .
> At the beginning of the interview, Detective Swisher advised [Washington] of his *Miranda* rights as follows:
>
> > "DET. SWISHER: Okay. Um, but I'm—I wanna talk to you about some stuff that we talked about on the way over here already.  But I need to read you your rights—have you had your rights read to you before?
> >
> > "[WASHINGTON]: Why's that?
> >
> > "DET. SWISHER: As just a precaution thing for you, so—

"[WASHINGTON]: So are you guys gonna be sending me to court or something?

"DET. SWISHER: Uh, I don't know.

"[DEFENDANT]: Alright, I'm okay.

"DET. SWISHER: You have the right to remain silent, and do you understand that? Have you—you had these rights read to you before? [WASHINGTON]: Yeah, yeah.

"DET. SWISHER: Okay. Anything you may—you say may be used against you in court, do you understand that?

"[WASHINGTON]: Yeah.

"DET. SWISHER: Okay. You have the right to a [sic ] presence of an attorney before and in—and during any questioning.  Do you understand that?

"[DEFENDANT]: Uh huh.

"DET. SWISHER: Okay.  If you cannot afford an attorney, one will be appointed to you free of charge before questioning if you want.  Do you understand that?

"[WASHINGTON]: (Unintelligible).

"DET. SWISHER: Now you've had those rights read to you before, and you understand them?

"[WASHINGTON]: Yeah."

[Washington] takes issue with the fact the detective never allowed him to answer whether he understood he had the right to remain silent.   However, later Detective Swisher asked [Washington] if he understood all his *Miranda* rights as recited and [Washington] answered in the affirmative.

The trial court determined that, while it appears clear from the medical evidence [Washington] has limited mental abilities, "they are not severe or significant enough to cause him to not understand the severity of the situation he found himself in."  The court further concluded: "[T]here is no doubt whatsoever that the statement is voluntary. It is knowing.  And it is appropriately admissible during his trial."

As partial support for this conclusion, the court explained: "[I]n terms of his ability to understand the significance of the import of what's going on during the interview, there are a variety of places in this where it becomes clear that [Washington] is only willing to share with law enforcement that portion that he thinks that they are already familiar with.  [¶]  He minimizes his role at various occasions throughout the

transcript, talking about how his partner did most of the things, that he only struck the victim one time, that he didn't touch anything in the robbery, that it was only his partner that shot the person.  He indicated remorse at various times.  The remorse portion, however, comes prior to the fact where he admits that he was actually involved in shooting the victim in the face."

At that point, defense counsel corrected the court that [Washington] had admitted only that he shot the victim in the chest, and the court accepted the correction.

The court continued: "He indicated when he is talking about his conduct of shooting the victim with the BB gun, that he intentionally only shot him in places which would not scar the victim, that it was his co-defendant or his partner that actually shot the victim in the face."

*Washington*, 2013 WL 29097, at *2-4.

In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Under this rubric, an interrogating officer must first advise the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her prior to engaging in a custodial interrogation.  *Id.* at 473-74.  Once *Miranda* warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

A defendant may waive his *Miranda* rights so long as the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A valid waiver of *Miranda* rights depends upon the totality of the circumstances.  "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the

product of a free and deliberate choice rather than intimidation, coercion, or deception,' and

'made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83

(2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Although some earlier Supreme

Court cases had indicated the government had a "heavy burden" to show waiver, *Berghuis*

explained that the burden is not too onerous.  *Berghuis*, 560 U.S. at 384.  Indeed, the waiver may

be implied by conduct, and need not be explicit or written.  *Id.* at 383.

> If the State establishes that a *Miranda* warning was given and the accused made
> an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a
> valid waiver" of *Miranda* rights.  The prosecution must make the additional showing that
> the accused understood these rights.  Where the prosecution shows that a *Miranda*
> warning was given and that it was understood by the accused, an accused's uncoerced
> statement establishes an implied waiver of the right to remain silent. . . .  As a general
> proposition, the law can presume that an individual who, with a full understanding of his
> or her rights, acts in a manner inconsistent with their exercise has made a deliberate
> choice to relinquish the protection those rights afford.

*Berghuis*, 560 U.S. at 384-85 (citations omitted).

In this case, Washington contended that, although his statements were not coerced and

Detective Swisher read him the required *Miranda* rights, his waiver was nonetheless ineffective

because the reading of them was somewhat confusing and he did not have the requisite mental

capacity to understand what he was doing.  But the record supports that the state appellate court

properly considered the totality of the circumstances in determining whether Washington

understood and voluntarily waived his *Miranda* rights, after which it concluded:

> [Washington] takes issue with the trial court's conclusion that he understood the
> severity of the situation in which he found himself.  He points out that, when questioned
> by Detective Swisher about the punishment he should receive for his involvement in this
> matter, [Washington] suggested he might have to wear an ankle monitor for a couple of
> years.

[Washington] misreads the record.  In response to the detective's question, [Washington] did not indicate the punishment he should receive but the punishment he would prefer.  It does not show a lack of intelligence to want to avoid prison time.  At any rate, the trial court's reference to [Washington] understanding the severity of the situation was not based on [Washington's] recognition of the potential punishment but his repeated attempts to minimize his involvement in the attack.  [Washington] repeatedly tried to deflect the blame onto Abella, thus demonstrating he understood he was in serious trouble.

A defendant's subnormal intelligence does not preclude a finding of voluntariness, although it is a factor that may be considered in the totality of the circumstances.  (*People v. Lara* (1967) 67 Cal. 2d 365, 386.)  In *In re Norman H.* (1976) 64 Cal. App. 3d 997, the minor, a 15–year–old with the intelligence of a seven or eight year old, was solicited by another to burglarize a residence.  While inside the residence, the other intruder stabbed and killed the resident.  The minor was thereafter arrested and, after being read his *Miranda* rights, confessed his participation in the burglary and murder.  (*Norman H.*, at pp. 1000, 1002.)  Based on other evidence presented in the case, including the minor's own testimony, the trial court concluded the minor understood his right to remain silent but chose instead to speak with police in an effort to tell his side of the story and place the blame on his accomplice.  (*Id.* at pp. 1001–1002.)  The Court of Appeal concluded substantial evidence supported the trial court's determination in this regard.  (*Id.* at pp. 1002–1003.)

We have reviewed the interview between Detective Swisher and [Washington] and agree with the trial court that, despite [Washington's] limited mental capacity, he understood the situation he was in and his right not to speak with the detective without the assistance of counsel.  However, [Washington] voluntarily chose instead to participate in the interview in an attempt to minimize his involvement in the crime.  The fact that this proved not to be a smart choice does not mean it was not, nevertheless, a choice freely and knowingly made.  We conclude the trial court did not err in denying [Washington's] motion to suppress.

*Washington*, 2013 WL 29097, at *4-5.

That conclusion was not an unreasonable determination of the facts in light of the record, as thoroughly and persuasively explained by the Court of Appeal.  And to the extent Washington renews his complaint that the detective did not allow him to answer whether he understood that he had the right to remain silent, that fact does not entitle Washington to relief either.  "[W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants" to invoke the privilege.  *Davis*

*v. United States*, 512 U.S. 452, 461 (1994).  Indeed, clarifying questions "minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement."  *Id.*  However, the Supreme Court has expressly "decline[d] to adopt a rule requiring officers to ask clarifying questions."  *Id*. at 461.  Rather, "[i]f the suspect's statement is not an [] unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning."  *Id.* at 461-62.  Washington has not cited any Supreme Court authority suggesting that Detective Swisher was not entitled to rely on Washington's later unequivocal acknowledgment that he understood his *Miranda* rights, and this Court is not aware of any.

In light of *Berghuis*, 560 U.S. at 383, this Court cannot find that the state court's determination that Washington's statements were not involuntary within the meaning of the Due Process Clause contravenes or unreasonably applies federal law.  *See Salinas v. Texas*, 133 S. Ct. 2174, 2179-83 (2013); *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011).  Washington is therefore not entitled to habeas relief on this claim.

  *Claim 4.*  <u>Insufficiency of the Evidence</u>

Finally, Washington argues that the evidence presented was legally insufficient to support his convictions for felony murder based on the robbery and for the special circumstance of murder committed during a robbery.  According to Washington, there is no evidence from which the jury could have concluded that he formed an intent to steal before or at the time of the assault that led to the victim's death, which is a necessary prerequisite for the felony murder conviction.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory

authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

As the Court of Appeal summarized:

> [Washington] argues no rational jury could have found, based on the evidence presented, that the intent to steal preceded or was concurrent with the assault or that the theft and the assault were part of one continuous transaction.  [Washington] asserts it is "undisputed that Deer was assaulted and sustained serious injuries leaving him mortally wounded" during the first encounter.  However, it was only during [Washington] and Abella's initial return to the scene that they took Deer's property.  This "after-formed intent to steal," [Washington] argues, is insufficient to support a felony murder conviction.

*Washington*, 2013 WL 29097, at *5.

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.  *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).  *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Id.* at 3-4.  Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

21

Here, a review of the testimony presented at trial supports the Court of Appeal's

conclusion that a reasonable trier of fact could readily conclude that the intent to steal did not

form after the fatal encounter.  As the Court of Appeal reasonably determined:

> [Washington's] arguments are based on false assumptions that the victim received mortal wounds in the initial assault and the theft must have occurred sometime thereafter.
> But the evidence presented at trial was that the victim continued to live through the initial assault, as well as the first and second returns to the scene.  In this last return, [Washington] and Abella shot the victim 19 times in the face and abdomen with a BB gun.  A reasonable jury could conclude from the foregoing evidence that [Washington] came back the first time to discover the victim was still alive and came back the last time to finish what he had started.  Hence, he was still in the process of murdering the victim when he formed the intent to steal from him, whether that occurred during the first encounter or thereafter.
> Furthermore, the prosecution's medical expert opined that the cause of death was both blunt force trauma from the beating and the BB gun injuries.  There was no conflicting evidence presented on this issue.  Thus, the jury could reasonably have concluded the victim had not received mortal wounds during the initial assault.
> [Washington] wrongly assumes the evidence shows that he and Abella stole the victim's property sometime after the first assault.  Rather, the evidence on that issue was unclear, except insofar as it is clear they took Deer's property at some point during the three encounters.  We conclude there is sufficient evidence from which a reasonable jury could conclude the theft and murder were part of a continuous transaction, thus supporting the felony murder conviction.

*Washington*, 2013 WL 29097, at *5-6.

Although it might have been possible to draw a different inference from the evidence,

this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S.

at 326.  For the reasons enumerated by the Court of Appeal and viewing the evidence in the light

most favorable to the verdict, the record does not compel the conclusion that no rational trier of

fact could have found proof that Washington killed Deer during the commission of a robbery.

Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court

concludes that there was sufficient evidence introduced at trial from which a rational trier of fact

could have found beyond a reasonable doubt that Washington was guilty of the robbery murder

special circumstance and thus guilty of first-degree murder under a felony-murder theory. Washington is not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Washington is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: January 13, 2017.

＿＿＿/s/James K. Singleton, Jr.＿＿＿＿
JAMES K. SINGLETON, JR.
Senior United States District Judge